THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARVIN WASHINGTON, Defendant-Appellant.

First District (5th Division)   No. 1—88—2894

Opinion filed June 19, 1992.—Rehearing denied September 23, 1992.

Randolph N. Stone, Public Defender, of Chicago (Kim L. Sorrells and
Donald S. Honchell, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kathleen
S. Howlett, and Celeste Stack, Assistant State's Attorneys, of counsel), for
the People.

JUSTICE LORENZ delivered the opinion of the court:
After a jury trial, defendant was convicted of murder and at-
tempted armed robbery. After a death penalty hearing, the jury found
defendant eligible for the death penalty but found sufficient mitigat-

ing factors to preclude imposition of the death penalty. The trial judge sentenced defendant to 40 years' imprisonment. Defendant appeals his conviction. We consider: (1) whether the prosecution proved defendant guilty beyond a reasonable doubt; (2) whether the trial court erred denying defendant a new trial in light of testimony from another witness during the sentence hearing that he, not defendant, committed the crimes; and (3) whether the trial court erred restricting defense counsel's cross-examination of the prosecution's primary witness.

We affirm.

On the evening of August 16, 1986, David Clark, Eugene Powell, and several other men were playing craps in the basement of a home at 5534 South Bishop in Chicago. The men had been drinking and gambling at various places in the neighborhood throughout the day. Shortly after 9:30 p.m., Frank Ellis knocked on the basement door, identified himself by his nickname, "Scooter," and was allowed to rejoin the group. Ellis challenged Clark to a game of chess and volunteered to retrieve a chess set. Clark went to the basement door with him. As Clark opened the door, a man appeared wearing a pantyhose over his head and carrying a handgun in his left hand. The man yelled: "Where do you think you're going? This is a stickup." Powell slammed the basement door into the man's left hand; someone simultaneously turned the lights off. The gun fired, killing the victim, Steve Baker. The other men dove for the floor. In the darkness, the gunman rummaged through the room for several minutes, then left. Powell called the police.

Defendant, Marvin Washington, was arrested. At defendant's jury trial for murder and attempted armed robbery, the State's three primary witnesses were Clark, Powell, and Ellis. Clark testified that he had been gambling with the men throughout the day; Clark knew defendant, Powell and Ellis from the neighborhood; Ellis had been with the group in the morning but defendant had not been with the group any time during the day; around 9:45 p.m. Ellis rejoined the group; Clark thought it was odd that Ellis volunteered to get a chess set because Ellis did not own one; when Clark opened the basement door, he observed the gunman, who had a pantyhose over his head and was carrying a .38 caliber revolver in his left hand; Powell slammed the door on his left hand and the gun went off; the lights went off at the same time and remained out for several minutes; the gunman fled.

Powell testified that he gambled during the day with the men; he also stated that Ellis rejoined the group that night, spoke to Clark,

and Ellis and Clark went to the basement door; Powell was standing next to the door and Clark opened the door towards Powell; Powell heard the gunman announce the stickup just as Clark heard; the gunman was wearing a "stocking cap" or "mask," but Powell could identify defendant's facial features; Powell did not see the handgun; Powell closed the door on the gunman to prevent the stickup; the lights went out, the gun fired, and Powell dove for the floor and stayed there for several minutes.

When Powell discovered that Steve Baker had been shot, he called the police. That night, he returned with the police to the area station. There, he gave the police the name of defendant's brother, Tony. The next day, Powell viewed a police lineup. Each member of the lineup stated: "Where do you think you're going? This is a stickup." Powell identified Marvin Washington in the lineup based on hearing his voice and seeing his "big eyes" and "big lips." None of defendant's four brothers, including Tony, were part of the lineup, even though they shared similar facial characteristics.

Ellis testified and admitted that he was involved in the incident. He offered his testimony in return for the prosecution's recommendation that he receive a five-year sentence. Ellis had no criminal history prior to this incident. Ellis explained that he had gambled with the men in the morning and then went home. In the evening, his uncle, Larry Reed, and defendant visited Ellis at his home. Reed and defendant asked Ellis to help them enter the basement where the men were gambling so that they could rob them. Ellis initially refused. Eventually, Ellis agreed to be the lookout for the robbery. Defendant promised Ellis he could share part of the money.

As described above, Ellis then gained entrance to the basement and challenged Clark to the chess match. Ellis himself gave defendant the pantyhose which defendant wore over his head. Ellis testified that he could see defendant's face through the pantyhose. He also recognized the handgun which he had seen in defendant's possession on previous occasions. Ellis had turned the lights out as the gun fired.

Ellis did not initially tell the police of his involvement. While at the police station at 2 p.m. the next day, however, he gave a court-reported statement. This statement provided, in part, that he talked to defendant about the stickup and agreed to act as the lookout. This statement makes no reference to Reed. At 9 p.m. that same night, after talking with his grandmother at length, Ellis gave a second court-reported statement. This statement provided that he had talked to Reed about the stickup and defendant was present during this conversation.

In view of one of the issues on appeal, we address three specific portions of defense counsel's cross-examination of Ellis. First, in regard to the first court-reported statement, defense counsel questioned Ellis: "Did you ever tell anyone that Marvin Washington wore a mask that you gave him?" The prosecution objected to the question on the ground that it assumed that the officers taking the statement asked him for such information. The trial court sustained the objection.

Second, defense counsel questioned Ellis about the following portion of the second court-reported statement:

> "I saw Marvin Washington coming in through the door with a big black revolver in his hand. *** He said, 'This is a stickup.' And then I saw his face."

Defense counsel attempted to impeach Ellis on the ground that this statement ("I saw his face") contradicted the fact that the gunman wore pantyhose over his face. The prosecution objected on the ground the statement was not a contradiction. The trial judge sustained the objection. Nonetheless, Ellis answered, "He had a pair of pantyhose on and you could see through them."

Third, in regard to the second court-reported statement, defense counsel questioned Ellis whether he was asked about the mask. Ellis answered that he was not asked such a question. Then defense counsel questioned Ellis whether he told anyone about the mask. The prosecution objected and the trial court sustained the objection. Defense counsel continued:

> "DEFENSE COUNSEL: Have you told anyone that besides prior to today?
>
> ELLIS: Yes, I have.
>
> Q. Who did you tell that to?
>
> A. I told the police officers."

Defendant's case began with the testimony of Larry Reed. Reed stated that he had played in the crap game earlier in the day, but he was not in the basement at the time of the murder. Reed denied that he planned to rob the gamblers with Ellis or with defendant. Reed testified that he went to defendant's house the night of the incident. He first stated he was with defendant between 9:30 p.m. and 10 p.m. He then stated he was with defendant between 8 p.m. and 9 p.m. In a written statement taken by the police prior to trial, Reed indicated he did not see defendant until after 11 p.m. Reed was unable to explain these discrepancies.

Two residents of the neighborhood and friends of defendant's mother both testified that at various times between 9 p.m. and 10 p.m. they saw defendant with some other men on the front porch of

defendant's home. Neither resident saw defendant continuously during this time and one admitted that a person could walk from defendant's home to the site of the murder in less than one minute.

Defendant's mother testified that she went to a wedding reception the night of the murder and returned home around 10 p.m. Defendant was home with Terry Reed, Larry Reed's twin brother, and some other men. Defendant received a phone call around 10:15 p.m. and left shortly thereafter. Defendant's girlfriend testified that she had made the phone call to defendant. Defendant and Terry Reed met the girlfriend and her sister and took them home.

Both sides rested. After closing arguments, the jury deliberated and found defendant guilty of murder and attempted armed robbery. The jury found defendant eligible for the death penalty but chose not to impose the death penalty after considering evidence in mitigation.

The parties then convened for the sentence hearing. At this time, Larry Reed, after receiving the court's admonishments, testified that he was the gunman the night of the incident. He explained that he had played craps with the men earlier in the day and that he lost money because the men cheated. He returned that night to recover his money. He denied that he intended to rob the men; he brought the handgun only because he believed the men playing craps had guns. He denied that he was wearing pantyhose over his face. He denied that Ellis had anything to do with his return to the basement. He arrived at the basement door just as Clark was leaving. When one of the men slammed the door on his left hand, he panicked and ran. Later, Reed learned that Steve Baker had been killed. He admitted that although he had known Clark for years, Clark never confronted him about the incident. He admitted that he is not left handed. As to the defendant, Reed first stated that he did not see defendant all that night but later stated that he had been with defendant around 11 p.m.

The trial judge found that the testimony of Reed was completely incredible. Conversely, the judge found that the testimony of Ellis at trial was exceptionally credible and was consistent with the testimony of Clark and Powell. The judge then denied defendant's request for a new trial and sentenced defendant to 40 years' imprisonment. Defendant appealed.

OPINION

We first address whether the prosecution proved defendant guilty beyond a reasonable doubt. Our standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found defendant guilty beyond a

reasonable doubt. *People v. Schott* (1991), 145 Ill. 2d 188, 582 N.E.2d 690.

██ The testimony of Clark, Powell, and Ellis provided the basis for defendant's conviction. Each witness' testimony corroborated the others'. Both Clark and Powell provided a consistent account of the day of gambling, the time the gunman appeared, the position of men around the basement door at the time of the shooting, and the events following the shooting. Clark, who knew defendant, testified that the gunman had a pantyhose over his head and was carrying a .38 caliber revolver in his left hand. Defendant was left handed. Both Clark and Powell heard the gunman say, "Where do you think you're going? This is a stick up." Powell identified defendant in a lineup after the shooting. This identification was based, in part, on his voice. Powell also recognized defendant's facial features through the pantyhose. We are cognizant of the factors which temper Clark and Powell's identification of defendant. However, neither Clark nor Powell had criminal histories and there is no apparent reason why they would lie.

In further support of this testimony, Ellis testified that he could see defendant's face through the pantyhose. More importantly, Ellis was able to identify defendant because he was actually involved in the incident. He testified that he gave defendant the pantyhose and he recognized the handgun which he had seen in defendant's possession on previous occasions. Although his statements may have varied, Ellis never changed his identification of defendant as the gunman. Despite the fact that Ellis offered his testimony in return for a reduced sentence, the trial judge found Ellis to be very credible.

In sum, when viewing the evidence in the light most favorable to the prosecution, we hold that the evidence was sufficient to allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt.

██ The next issue is whether the trial court erred in denying defendant's motion for a new trial in light of Reed's testimony at the sentence hearing. Close scrutiny is applied to motions for a new trial based on newly discovered evidence in order to prevent fraud which parties may be tempted to use as a last resort to avoid an adverse verdict; the trial court's ruling will not be disturbed absent a showing of a manifest abuse of discretion, and the burden is on the applicant to rebut the presumption that the verdict was correct. (*People v. Waldroud* (1987), 163 Ill. App. 3d 316, 516 N.E.2d 623.) To warrant a new trial, the evidence must be of such a conclusive character that it would probably change the result at the new trial; the evidence must be material and not merely cumulative; the evidence must have been

discovered after the trial and must be of such a character that it could not have been discovered before trial in the exercise of due diligence. *People v. Miller* (1980), 79 Ill. 2d 454, 404 N.E.2d 199.

We agree with the trial judge that Reed's testimony was incredible. The record suggests that Reed fabricated testimony throughout the proceedings. For example, he signed a written statement at the police station denying that he saw the defendant prior to 11 p.m., yet at trial he testified that he *had* been with defendant prior to 11 p.m. Reed never demonstrated a shred of believability. Reed's testimony at defendant's sentence hearing attempted to exculpate defendant without implicating himself—he would have the court believe that the whole incident was merely an accident. This contradicts all of the other testimony. In sum, Reed's testimony was not of such character that it would change the result at a new trial. Therefore, we hold that the trial court did not err in denying defendant's motion for a new trial.

■ The next issue is whether the trial court improperly restricted defense counsel's cross-examination of the prosecution's primary witness, Ellis. We have considered each of the three excerpts of the cross-examination complained of by defendant and find that defendant is not entitled to a new trial. We believe that the trial court properly sustained the prosecution's objections because defense counsel premised the questions on imprecise characterizations of Ellis' statements and testimony. Furthermore, even though the trial court properly sustained the objections, the record shows that Ellis answered each of the questions. Therefore, no error resulted.

We note that the trial court's sentencing order appears to credit defendant for his time spent in custody. The order does not, however, specify the amount of credit. We remand this case for clarification on this point.

Conviction affirmed; remanded pursuant to the above instruction.

McNULTY, P.J., and MURRAY, J., concur.